## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JEFFREY CARMICHAEL-BEY,** | |
| **Plaintiff,** | |
| | **Case No. 25-cv-01615-MAB** |
| **v.** | |
| **WEXFORD HEALTH SOURCES, INC.,** | |
| **SARA SIMPSON,** | |
| **WARDEN JEFFREY WEHKING,** | |
| **MRS. MORRISON,** | |
| **TAMI STAUFFER,** | |
| **JENNIFER HODGE,** | |
| **JOHN DOE 1,** | |
| **PERRY MYERS,** | |
| **ARVINDER ARORA,** | |
| **SERGEANT MORRISON,** | |
| **SERGEANT CAGE,** | |
| **JOHN DOE 2,** | |
| **JOHN DOE 3,** | |
| **JOHNDOE 4,** | |
| **ELLIOT WAGNER,** | |
| **DAVID ZHU, and** | |
| **JT WATSON,** | |
| **Defendants.** | |

## <u>MEMORANDUM AND ORDER</u>

**BEATTY, Magistrate Judge:**

Plaintiff Jeffrey Carmichael-Bey, an inmate of the Illinois Department of Corrections (IDOC) who is currently incarcerated at Centralia Correctional Center, brings this civil action pursuant to 42 U.S.C. § 1983 for violations of his constitutional rights. The

Complaint is now before the Court for preliminary review pursuant to 28 U.S.C. § 1915A.[1] Under Section 1915A, any portion of a complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or requests money damages from a defendant who by law is immune from such relief must be dismissed. *See* 28 U.S.C. § 1915A(b).

## THE COMPLAINT

Plaintiff alleges the following: On February 10, 2024, Plaintiff injured himself while running sprints in the gymnasium at Centralia Correctional Center (Centralia). (Doc. 1, p. 4). During his sprints, his foot became entangled in carpet, which was sticking out of the floor, causing him to hyper-extend his knee and fall to the floor. (*Id.*). When the injury occurred, Plaintiff heard a "popping" sound. (*Id.*). His ears started ringing, his vision became extremely blurred, he started sweating profusely, and he started having coughing fits. (*Id.* at p. 5). Plaintiff was escorted to the stairs located in front of the observation station where the supervisor of leisure time services (LTS), Mr. Morrison, was observing prisoners with other members of staff. (*Id.* at p. 4-5). Mrs. Morrison supervises and is responsible for the property, equipment, and prisoners located in the gymnasium. (*Id.* at p. 5). Mrs. Morrison knew that the carpet posed a danger to prisoners because she had parts of the carpet that were "sticking up" repaired with superglue. (*Id.*). She failed, however, to place an order to have the maintenance department repair,

---

[1] The Court has jurisdiction to screen the Complaint in light of Plaintiff's consent to the full jurisdiction of a magistrate judge and the Illinois Department of Corrections' and Wexford's limited consent to the exercise of magistrate judge jurisdiction as set forth in the Memorandum of Understanding between the Illinois Department of Corrections, Wexford, and this Court.

replace, or pull-up the carpet altogether. (*Id.*). By not repairing the carpet properly, Mr. Morrison "perpetuated the unsafe conditions in the gymnasium." (*Id.*). Dozens of inmates were injured due to the condition of the carpet. (*Id.*).

Nurse Stauffer came to the gym to escort Plaintiff to the healthcare unit in a wheelchair. (Doc. 1, p. 5). Three times Plaintiff had to explain what happened to him to Stauffer. (*Id.*). Stauffer took his vitals, cleaned the skin abrasion on his leg, wrapped his knee in an ACE bandage, and prescribed 200 mg of Ibuprofen. (*Id.*). Stauffer asked Plaintiff if he could move his leg, which he could, but it was painful. (*Id.*). When an officer asked Stauffer what had happened, Stauffer responded, "He got his noggin rocked." (*Id.* at p. 6). Nurse Hodge then arrived, and she and Stauffer began exchanging stories about men in their families who had been injured "due to their masculinity," while Plaintiff sat in pain. (*Id.*). Stauffer then had Plaintiff wheeled to the housing unit, rather than to the infirmary. (*Id.*). This decision was contrary to the policy of Wexford Health Sources, Inc. (Wexford) that instructs that when an inmate cannot walk out of the healthcare unit then he is to be admitted to the infirmary for observation. (*Id.*). Stauffer also did not contact a physician in order to determine if Plaintiff needed emergency care at an outside hospital or further testing. (*Id.*).

After Plaintiff returned to his housing unit, he asked Correctional Officer Answorth if he could have a "medical lay-in sheet" so that his evening meal could be brought to him or a pair of crutches so that he could attend "chow." (Doc. 1, p. 7). Answorth "looked into the matter" and informed Plaintiff that Sergeant John Doe 2 spoke to Lieutenant John Doe 3 who then spoke to John Doe 4 in the healthcare unit, and John

Doe 4 reported that because Plaintiff had walked out of the healthcare unit, he could walk to the chow hall. (*Id*.). Plaintiff states that the John Doe Officers knew about Plaintiff's injury and that he had not walked out of the healthcare unit but was wheeled back to his cell in a wheelchair. (*Id*.). The John Doe Officers intentionally gave false information about his condition, effectively denying him the ability to eat. (*Id*.).

At some point, Answorth sent a note to the "second shift housing unit walk officer," Correctional Officer Simmons, notifying him that Plaintiff would need a lay-in tray. (Doc. 1, p. 8). Simmons contacted Sergeant Cage, who informed Simmons that Plaintiff would not receive a lay-in tray without paperwork, but if Plaintiff walked to chow and fell on the walk, then he would be taken to the healthcare unit where he would receive a tray. (*Id*.). Because Plaintiff was being denied dinner, he had another inmate inform staff that he needed a "med tech" and a "crisis team." (*Id*.). Sergeant Morrison and John Doe 1, a med tech, came to Plaintiff's cell. (*Id*.). Plaintiff explained the situation regarding his inability to walk to chow and being denied a medical lay-in sheet so that he could receive dinner in his cell. (*Id.* at p. 8-9). Sergeant Morrison repeated that false information that Plaintiff had walked out of the healthcare unit and since there was no paperwork, Plaintiff could not have his meal delivered to him. (*Id.* at p. 8). Plaintiff then requested crutches, and Sergeant Morrison informed Plaintiff that crutches were not allowed in general population. (*Id*.). Plaintiff states that he has seen dozens of inmates on the facility's grounds with crutches, canes, and walkers. (*Id*.). Sergeant Morrison then told Plaintiff how he had torn his ACL several times in high school and how after a few days he was moving around on the leg again. (*Id*.). Sergeant Morrison also shared that his

daughter had shoulder surgery and was "running around the next day like nothing ever happened." (*Id.*). Plaintiff took offense to these stories. (*Id.*).

The following morning, Plaintiff sent a request slip to the healthcare unit with the word "EMERGENCY" written on it. (Doc. 1, p. 10). Plaintiff was taken in a wheelchair to the healthcare unit around 9:30 a.m. (*Id.*). Plaintiff was again seen by Nurse Stauffer, who checked his vitals and asked him to try to stand and walk. (*Id.*). Plaintiff was able to stand by shifting his weight to his right leg but was unable to walk. (*Id.*). Stauffer requested x-rays and issued Plaintiff a medical lay-in sheet. (*Id.*). She instructed Plaintiff to try to "get up" every few hours and walk on the leg. (*Id.*). Plaintiff requested crutches, and Stauffer stated that if he was issued crutches then he would have to be admitted to the healthcare unit's infirmary, and he would lose his property. (*Id.*). Plaintiff responded that he "had things to finish up doing anyways and with the medical lay-in sheet he'd have meals brought to him for a few days." (*Id.*). Plaintiff was then returned to his housing unit in a wheelchair. (*Id.*). Plaintiff states that Stauffer's instruction to attempt to walk every few hours was ill-advised and premature. (*Id.*).

Plaintiff received his medical lay-in sheet around 4:00 p.m. and gave it to the housing unit walk officer so that he could have his meal tray delivered to his cell. (Doc. 1, p. 11). The officer looked at the paperwork and said that the medical lay-in sheet did not "secure him a lay-in tray." (*Id.*). The officer explained that the sheet informed IDOC staff that the inmate is on movement restriction from activities and work but did not address "going to dietary." (*Id.*). The officer told Plaintiff that next time he should let the nurse know to write that he receives a lay-in tray. (*Id.*).

On February 14, 2024, x-ray technician, Elliot Wagner, took x-rays of Plaintiff's leg. (Doc. 1, p. 12). Wagner told Plaintiff that the films would be developed and returned to the facility either that evening or the following day. (*Id.*). Wagner signed the radiology report on February 14, 2024, and it is unclear when he sent the report to Centralia. (*Id.*).

Following the x-rays, Plaintiff was returned to his housing unit. (Doc. 1, p. 13). He sent request slips marked "emergency" saying that his leg was in constant pain and that he needed a refill of Ibuprofen on February 17, 21, and 25, 2024, but he did not receive an answer. (*Id.*). Plaintiff relied solely on self-made ice packs to help with the pain. (*Id.*). The pain was so severe that he had difficulty sleeping and performing daily tasks. (*Id.*).

On February 28, 2024, Plaintiff was seen by Dr. Perry Myers in the healthcare unit. (Doc. 1, p. 13). While waiting for his exam, Plaintiff was left unattended. (*Id.*). His name was called, and he was unable to maneuver the wheelchair himself, so he stood up and hopped on his good leg using the wall for support into the exam room. (*Id.*). Dr. Myers asked Plaintiff how long he had been moving "like this." (*Id.* at p. 14). Plaintiff explained that he had been unable to walk since the accident and that Nurse Stauffer had instructed him to try and walk so, he had been trying to exercise, doing body-weighted squats and lunges, using the desk and shelf in his cell for support. (*Id.*). Dr. Myers told Plaintiff that he should not be putting weight on his leg at all because it is fractured and displaced. (*Id.*). Dr. Myers issued Plaintiff a permit for crutches and a low bunk bed. (*Id.*). Dr. Myers also prescribed Tylenol and naproxen and ordered that Plaintiff see an orthopedic specialist. (*Id.*). Plaintiff then returned to the housing unit using crutches. (*Id.*).

On March 15, 2024, Plaintiff saw an orthopedic specialist, Dr. David Zhu, in Mount

Vernon, Illinois. (Doc. 1, p. 15). Dr. Zhu stated that because thirty-five days had passed since the initial fracture, Plaintiff had a "closed fracture of tibial plateau" and needed a CT scan as soon as possible. (*Id.*). Plaintiff did not receive a CT scan until April 19, 2024, five weeks later. (*Id.*). During this time, Plaintiff's pain continued, and he was only given Tylenol and naproxen. (*Id.*). Dr. Khan did not give Plaintiff any stronger medication for the pain. (*Id.*).

Plaintiff did not have a follow-up appointment with Dr. Zhu until June 7, 2024. (Doc. 1, p. 16). Dr. Zhu reported that Plaintiff's fracture was "split and depressed….the bone is now scarred into place." (*Id.*). Dr. Zhu recommended that Plaintiff be referred to a trauma specialist for treatment. (*Id.*).

On July 31, 2024, Plaintiff had an appointment with Dr. Watson, an orthopedic trauma surgeon. (Doc. 1, p. 17). Dr. Watson explained that because Plaintiff went untreated for so long, "the bone healed with a depression." (*Id.*). Plaintiff's "weight distribution now causes him to shift to the left when stands or walks. The shift causes the meniscus to make contact with the depression speeding up the deterioration of the meniscus, which will eventually destroy the meniscus, requiring a total knee replacement surgery." (*Id.*). Dr. Watson gave Plaintiff two options: (1) he could have a "reconstructed tibial plateau fusion with bone from some where else to replace the existing damaged bone;" or (2) he could wait to have surgery "down the road due to wear-and-tear on the meniscus." (*Id.*). Dr. Watson recommended the second option, since Plaintiff had built up his pain tolerance and the left leg could bear weight with the assistance of a walking stick. (*Id.*).

As a follow-up to his appointment with Dr. Watson, on August 7, 2024, Plaintiff had an appointment with Dr. Arvinder Arora at Centralia. (Doc. 1, p. 18). At the appointment, Dr. Arora explained that she would have to reschedule because the medical records from Plaintiff's appointment with Dr. Watson were not yet in Plaintiff's medical file. (*Id.*). Dr. Arora stated that because of staffing shortages, she was not surprised. (*Id.*). Plaintiff was not called back until November 6, 2024. (*Id.*).

During Plaintiff's next appointment with Dr. Arora, she asked Plaintiff if he remembered Dr. Watson's recommendation. (Doc. 1, p. 19). Plaintiff recounted how he was to receive physical therapy to strengthen his muscles and ligaments that support the knee, but that ultimately surgery would need to be done at some point. (*Id.*). Dr. Arora agreed that physical therapy is very important, and later she located Plaintiff's records and rescheduled him for another appointment. (*Id.*). Dr. Arora failed, however, to refer him to physical therapy. Plaintiff did not begin physical therapy until another seven months had passed. (*Id.*).

## DISCUSSION

Based on Plaintiff's allegations and his articulation of his claims, the Court designates the following counts:

> **Count 1:** Eighth Amendment claim against Supervisor Mrs. Morrison for deliberate indifference to the risk posed by the damaged carpet in the gymnasium resulting in Plaintiff's injury.

> **Count 2:** Eighth Amendment claim against Nurse Stauffer, Dr. Wagner, Dr. Zhu, Dr. Watson, Dr. Myers, Dr. Arora, Nurse Hodge, and Wexford for deliberate indifference to Plaintiff's serious medical need, injury to his left leg and associated pain.

**Count 3:**     Eighth Amendment claim against John Doe 2, John Doe 3, and John Doe 4 for giving false information about the status of Plaintiff's physical condition which resulted in Plaintiff missing a meal.

**Count 4:**     Eighth Amendment claim against Sergeant Cage, Sergeant Morrison, and John Doe 1 for denying Plaintiff the right to be a state provided meal.

**Count 5:**     Claim for injunctive relief against Warden Wehking and Healthcare Unit Administrator Simpson.

The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. **Any other claim that is mentioned in the Complaint but not addressed in this Order should be considered dismissed without prejudice as inadequately pled under the *Twombly*[2] pleading standard.**

## Count 1

To prevail on an Eighth Amendment claim based on constitutionally inadequate prison conditions, the prisoner must plead that (1) the conditions in the prison were objectively "sufficiently serious so that a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities," and (2) prison officials acted with deliberate indifference to those conditions. *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (internal citations and quotation marks omitted). An "objectively 'sufficiently serious risk is one that society considers so grave that to expose any unwilling individual to it would offend contemporary standards of decency." *Christopher v. Buss,* 384 F. 3d 879, 882 (7th Cir. 2004) (internal citations omitted).

---

[2] *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

Plaintiff's hazardous condition, a carpet in disrepair in the gymnasium, does not "suggest a substantial risk of serious harm that reflects the deliberate indifference required to impose liability under §1983." *Smith v. Luth*, No. 14-cv-01030-NJR, 2014 WL 5334273, at *3 (S.D. Ill. Oct. 20, 2024). *See also Pyles*, 771 F. 3d 403, 410 (7th Cir. 2014) ("Federal courts consistently have adopted the view that slippery surfaces and shower floors in prisons, without more, cannot constitute a hazardous condition of confinement."); *Hardin v. Baldwin*, 770 F. App'x 289, 290 (7th Cir. 2019) (the risk of tripping on an uneven sidewalk "is no worse than the risk present on slippery floors in prison showers"); *Cook v. Brown*, No. 17-cv-527-SMY-RJD, 2019 WL 2176960 (S.D. Ill. 2019) (observing that while "ripples" in a gymnasium carpet present "a possibility that inmates might trip, such condition does not present sufficiently substantial risk of serious injury to implicate the constitution and trigger liability for an accidental fall"); *Andress v. Richard*, No. 16-cv-00011-WTL-MJD, 2018 WL 1794910, at *5 (S.D. Ind. 2018) (finding at summary judgment that computer cords, which caused the plaintiff who had prosthetic leg to trip and fall and break his leg, was not a sufficiently serious hazard to invoke the Eighth Amendment). Prison officials are not required to maintain a "maximally safe environment," *Anderson v. Morrison*, 835 F.3d 681, 683 (7th Cir. 2016) (citing *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001)), and federal courts "consistently have held that poorly maintained surfaces in prisons do not pose a substantial risk of harm, even when defendants are aware of the condition." *Coffee v. Barber*, No. 20-cv-965-jdp, 2021 WL 2134921, at *1(W.D. Wisc. 2021). Accordingly, Count 1 is dismissed.

**Count 2**

Prison officials may be liable for an Eighth Amendment violation if they are "deliberately indifferent to prisoners' serious medical needs." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). "Deliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, administers 'blatantly inappropriate' medical treatment, *Edwards v. Snyder,* 478 F.3d 827, 831 (7th Cir. 2007), acts in a manner contrary to the recommendation of specialists, *Arnett*, 658 F.3d at 753, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2019) (citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)). As with all Eighth Amendment claims, to rise to the level of deliberate indifference, the conduct must be akin to criminal recklessness. *Klebanowski v. Sheahan,* 540 F. 3d 633, 639-40 (7th Cir. 2008). Conduct that is negligent or even grossly negligent does not violate the Eighth Amendment. *See Figgs v. Dawson,* 829 F. 3d 895, 903 (7th Cir. 2016).

The Court finds that Plaintiff has sufficiently stated a claim against Nurse Stauffer, for improperly treating his injury and sending him back to his housing unit on February 10, 2024, and then again on February 11, 2024. Specifically, Plaintiff alleges that following the February 11 visit, Stauffer directed Plaintiff return to his cell with instructions to "get up every few hours and walk on the leg" and did not ensure that Plaintiff's meals would be delivered to him, forcing him to place additional weight on his leg to receive his meals each day. (Doc. 1, p. 6, 10). Count 2 will proceed against Nurse Stauffer.

Count 2 is dismissed as to Dr. Wagner. Plaintiff states that Dr. Wagner reviewed

and signed the x-ray report on February 14, 2024, confirming that Plaintiff had an "acute left knee fracture." (Doc. 1-1, p. 43). Plaintiff did not have an appointment with Dr. Myers, however, until two weeks later, and it is unclear when the report was sent to Centralia. (Doc. 1, p. 12). Plaintiff asserts that if the delay in his appointment and treatment was caused by Dr. Wagner waiting to send the x-ray report, then Dr. Wagner "took a reckless course of action," and Dr. Wagner's delay in sending the x-ray report caused irreparable harm to Plaintiff's leg. (*Id.*). Assuming Dr. Wagner did not promptly submit the x-ray report to the facility, there is nothing to suggest that the delay was deliberate, and negligence "does not give rise to a constitutional violation." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). Accordingly, Count 2 is dismissed as to Dr. Wagner.

Plaintiff asserts that Dr. Zhu and Dr. Watson, who were both specialists at outside medical facilities, failed to report the medical malpractice being committed by Centralia medical staff and, what Plaintiff says was barbaric healthcare he was receiving under the supervision of IDOC and Wexford. (Doc. 1, p. 16, 17, 18). Because these doctors did not alert the proper authorities regarding the lack of care Plaintiff was receiving, he claims they were complicit in the deliberate indifference to his safety. (*Id.*). As a general rule, however, Section 1983 does not provide recourse against private citizens (i.e. someone who is not a state actor).[3] Here, Plaintiff does not allege that these individuals acted under color of state or local law or in concert with state actors to deprive him of his constitutional rights.

---

[3] "A mere referral of a prisoner for treatment by an outside medical provider does not transform such a provider into a state actor that may be sued under § 1983—more is required." *Wainwright v. Trost*, No. 17-cv-1055-SMY, 2017 WL 5973026, at *3 (S.D. Ill. 2017) (citing *Rodriguez*, 577 F. 3d at 822-830).

Even if Dr. Zhu and Dr. Watson were acting under the color of state law when treating Plaintiff, their conduct does not amount to deliberate indifference. Individuals cannot be vicariously liable for the conduct of others under Section 1983. *Gaston v. Ghosh,* 920 F. 3d 493, 497 (7th Cir. 2019). Furthermore, there is no constitutional duty to report the past errors in Plaintiff's medical care that they had observed while treating him. *See Burks v. Raemisch,* 555 F.3d 592 (7th Cir. 2009) ("public employees are responsible for their own misdeeds but not anyone else's"); *Wright v. Sherrod,* 2026 WL 100580, at * (S.D. Ill. 2026); *Yerks v. Hoftiezer*, No. 17-CV-172-JPS, 2017 WL 1031208, at *5 (E.D. Wisc. 2017). The factual allegations simply do not allow the inference that they acted with deliberated indifference in treating Plaintiff. Count 2 is dismissed as to Dr. Zhu and Dr. Watson.

Count 2 will proceed against Dr. Myers and Dr. Arora, who appear to be Plaintiff's treating physicians at Centralia and whose actions or omissions are alleged to have caused or contributed to Plaintiff's delay of care and ongoing pain.

Count 2 is dismissed as to Nurse Hodge. Plaintiff alleges that Nurse Hodge came into the interview room while he was being seen by Nurse Stauffer on February 10, 2024, following his fall. (Doc. 1, p. 6). Hodge and Stauffer talked about personal matters while he sat there waiting for care, prolonging his pain and suffering. (*Id*.). While the conduct Plaintiff attributes to Hodge was unprofessional and may rise to the level of negligence , it does but does not rise to the level of a constitutional deprivation under Section 1983. *See Forbes v. Edgar,* 112 F. 3d 262, 267 (7th Cir. 1997) (prisoners are not "entitled to demand specific care[, nor are they] entitled to the best care possible.").

Count 2 is also dismissed against Wexford. Plaintiff asserts that Wexford:

> [S]howed deliberate indifference to [Plaintiff's] serious medical needs when
> they received referrals from medical practi[t]ioners and Wexford medical
> personnel at Centralia CC for treatment of his broken leg…[and] delayed
> proceeding these referrals and emails which unnecessarily prolonged
> Plaintiff's pain and suffering for 396 days contributing to a permanent
> physical disability.

(Doc. 1, p. 24). As a corporation, Wexford can only be held liable for deliberate
indifference if it had a policy or practice that caused the alleged violation of a
constitutional right. *Woodward v. Corr. Med. Serv. of Ill., Inc.*, 368 F.3d 917, 927 (7th
Cir.2004). *See also Jackson v. Ill. Medi–Car, Inc.*, 300 F.3d 760, 766 n. 6 (7th Cir.2002) (private
corporation is treated as though it were a municipal entity in a Section 1983 action).
Plaintiff does not identify a policy or practice that caused a violation of his constitutional
rights. On the contrary, it seems as if staff were failing to act in accord with a Wexford
policy. In fact, Plaintiff states that despite the policy, he was released from healthcare unit
on February 10, 2024, and not x-rayed and taken to emergent care. (Doc. 1, p. 23). In other
words, Plaintiff is claiming that Wexford employees failed to follow a policy; not that a
specific policy caused a constitutional violation. Accordingly, Count 2 is dismissed as to
Wexford.

### Counts 3 and 4

Plaintiff asserts that healthcare unit staff member John Doe 4 told Lieutenant John
Doe 3 that Plaintiff "walked out of the HCU," and John Doe 3 relayed this false
information to Sergeant John Doe 2. (Doc. 1, p. 7). All three Defendants knew that this
was incorrect information. Because Plaintiff's physical condition was intentionally falsely
reported, he was not issued paperwork for a medical lay-in or crutches, resulting in

Plaintiff being denied a meal on the evening of February 10. (*Id.*).

When he did not receive a meal, Plaintiff spoke to Sergeant Cage, who stated Plaintiff would not receive a meal without the proper paperwork. (Doc. 1, p. 8). Plaintiff then requested a crisis team, and Sergeant Morrison and Med Tech John Doe 1 came to his cell. Sergeant Morrison stated that because Plaintiff had "walked out of the HCU" and there was no paperwork directing a medical lay-in, he could not order for Plaintiff's meal to be brought to the cell. Plaintiff asserts that Sergeant Morrison then proceeded to impersonate a medical professional by telling stories about a personal ACL injury, while John Doe 1 stood by without ever "speaking up as a medical professional." (*Id.* at p. 9).

These allegations do not amount to a constitutional claim against Sergeant Cage, Sergeant Morrison, and John Does 1, 2, 3, and 4. Again, while the conduct alleged is certainly unprofessional and even intentional, the end result is that Plaintiff missed one meal - his evening meal. While inmates are entitled to be provided with adequate food, *Knight v. Wiseman,* 590 F.3d 458, 463 (7th Cir. 2009), "[t]here is, of course, a de minimus level of imposition with which the Constitution is not concerned," *Ingraham v. Wright,* 430 U.S. 651, 674 (1977). Missing a single meal, while unpleasant, did not impose on Plaintiff the type of severe harm required to amount to cruel and unusual punishment under the Eighth Amendment. *See Morris v. Kingston,* 368 F. App'x 686, 689 (7th Cir. 2010) (concluding that plaintiff had shown that missing 17 meals of 23 days caused serious harm or lasting detriment); *Dobbey v. Ill. Dep't of Corr.*, 574 F.3d 443, 446 (7th Cir. 2009) ("[H]arassment, while regrettable, is not what comes to mind when one thinks of 'cruel and unusual' punishment."). *See also Bishop v. Johnson*, No. 19-cv-1034-SMY, 2019 WL

6615402, at *1 (S.D. Ill. Dec. 5, 2019) (finding that the plaintiff who alleged a correctional officer threatened him and took away his meal failed to state a claim); *Ybarra v. Neal*, No. 21-cv-418-RLM-MGG, 2021 WL 5741328, at *2 (N.D. Ind. Dec. 2, 2021) (missing a single meal did not violate the Eighth Amendment where plaintiff did not allege severe harm suffered). Thus, Plaintiff has failed to plead an Eighth Amendment violation, and Counts 3 and 4 are dismissed.

### Count 5

Plaintiff sues Warden Wehking and Health Care Administrator Simpson in their official capacities only. (Doc. 1, p. 2). A state prison official can be named in an official capacity on a claim for prospective injunctive relief, but only if there is an ongoing constitutional violation. *Marie O. v. Edgar*, 131 F.3d 610, 615 (7th Cir. 1997). Additionally, the any injunctive relief ordered can "extend no further than necessary to remedy the constitutional violation." *Rasho v. Jeffreys*, 22 F.4th 703, 712-13 (7th Cir. 2022) (outlining the limited forms of injunctive relief available in the prison setting). *See also* 18 U.S.C. §3626(a). Plaintiff requests the following forms of injunctive relief: an order directing for the carpet in the gymnasium to be fixed; an order requiring enforcement of uniform policies and procedures at Centralia; an order directing the creation of a medical lay-in document that clearly expresses that the document holder is to receive lay-in trays from dietary; and an order directing his transfer to another facility to avoid retaliation. (Doc. 1, p. 26).

Currently, Plaintiff is proceeding on an Eighth Amendment claim against Nurse Stauffer, Dr. Myers, and Dr. Arora for providing deficient care for his injured leg

beginning on February 10, 2024, and lasting until Plaintiff finally received physical therapy on March 13, 2025. There is no indication in the Complaint that Plaintiff continues to receive constitutionally inadequate medical care for his leg, and he cannot receive "injunctive relief based on a past violation." *Kreilein v. Horth,* 854 F. App'x 733, 735 (7th Cir. 2021). Additionally, his requested forms of relief are not narrowly tailored and do not align with the surviving claims of this case. *See e.g., Tatum v. Hunter,* No. 22-2411, 2023 WL 4215396, at *5 (S.D. Ill. 2023); *aff'd* in *Tatum v. Hunter,* No. 23-2253, 2024 WL 3177132, at *1 (7th Cir. 2024). The official capacity claim against Wehking and Simpson for injunctive relief must therefore be dismissed.

## PENDING MOTION

Plaintiff has filed a Motion for Recruitment of Counsel (Doc. 3), which is **DENIED**.[4] In an attempt to find an attorney, Plaintiff states that he wrote to several law firms asking for assistance, but he has not received any responses. Plaintiff provides only a list of the names and addresses of nine law firms he contacted. He does not, however, provide any sort of information regarding any of these law firms indicating the firm has declined representation of Plaintiff. Based on this limited information, the Court cannot determine that Plaintiff has made sufficient efforts on his own to find a lawyer. Thus, Plaintiff has failed to meet his threshold burden of demonstrating reasonable attempts to recruit counsel, prior to seeking assistance from the Court.

The Court also finds that Plaintiff is capable of representing himself, at least for

---

[4] In evaluating the Motion for Recruitment of Counsel, the Court applies the factors discussed in *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007) and related authority.

now. Plaintiff argues that he is unable to proceed pro se because he does not understand case law and "legal talk." This case, however, is in the very early stages. Defendants have not been served, and extensive argument and legal research are not required at this time. *See Kadamovas v. Steven*, 706 F.3d 843, 845 (7th Cir. 2013) ("[U]ntil the defendants respond to the complaint, the plaintiff's need for assistance of counsel... cannot be gauged."). Plaintiff has some high school education, and his Complaint, which is typed and well organized, demonstrates an ability to construct coherent sentences and relay information to the Court. Plaintiff, therefore, appears competent to litigate this matter without representation at this juncture. Once discovery has commenced, if Plaintiff has significant difficulty, he may refile his motion. Should Plaintiff choose to move for recruitment of counsel at a later date, the Court directs Plaintiff to include supporting documentation of his efforts to recruit counsel, such as the letters from the attorneys who declined representation or copies of his payment vouchers for postage.

Plaintiff's Motion for Service of Process is **DEEMED moot.** (Doc. 4). Plaintiff has been granted pauper status (Doc. 8), and the Court is obligated to arrange service for incarcerated persons proceeding in forma pauperis.

### DISPOSITION

For the reasons stated above, the Complaint survives preliminary review pursuant to Section 1915A. **COUNT 1** is **DISMISSED without prejudice**. **COUNT 2** shall proceed against Nurse Stauffer, Dr. Myers, and Dr. Arora, and is **DISMISSED without prejudice** against Dr. Wagner, Dr. Zhu, Dr. Watson, Nurse Hodge, and Wexford. **COUNTS 3**, **4**, and **5** are **DISMISSED without prejudice**. Because there are no surviving claims against

Wexford, Simpson, Wehking, Mrs. Morrison, Hodge, John Does 1-4, Sergeant Morrison, Cage, Wagner, and Zhu, the Clerk of Court shall **TERMINATE** them as defendants on the docket.

The Clerk of Court shall prepare for Nurse Stauffer, Dr. Myers, and Dr. Arora the following: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint, and this Memorandum and Order to each Defendant's place of employment as identified by Plaintiff. If a Defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on the Defendant, and the Court will require the Defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a Defendant cannot be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the Defendant's current work address, or, if not known, his last known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Because this suit includes allegations regarding physical injury and medical care, the Clerk of Court is **DIRECTED** to enter the standard qualified protective order pursuant to the Health Insurance Portability and Accountability Act.

**Pursuant to Administrative Order No. 244, Defendants need only to respond to**

the issues stated in this Merit Review Order.

Finally, Plaintiff is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **14 days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

**DATED: February 10, 2026**

**/s/ Mark A. Beatty_____**
**MARK A BEATTY**
**United States Magistrate Judge**

**NOTICE TO PLAINTIFF**

The Court will take the necessary steps to notify the appropriate defendants of your lawsuit and serve them with a copy of your complaint. After service has been achieved, the defendants will enter their appearance and file an Answer to the complaint. It will likely take at least **60 days** from the date of this Order to receive the defendants' Answers, but it is entirely possible that it will take **90 days or more**. When all of the defendants have filed Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiff is advised to wait until counsel has appeared for the defendants before filing any motions, to give the defendants notice and an opportunity to respond to those motions. Motions filed before defendants' counsel has filed an appearance will generally be denied as premature. Plaintiff need not submit any evidence to the Court at this time, unless otherwise directed by the Court.